## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## EASTERN DIVISION

**ROBERT BULAS, M.D.,**

        **Plaintiff,**          :

**v.**

        **Case No. 2:22-cv-112**
        **Judge Sarah D. Morrison**
        **Magistrate Judge Chelsey M.**
        **Vascura**

**UNUM LIFE INSURANCE**
**COMPANY OF AMERICA, *et al.*,**     :

        **Defendants.**

### OPINION AND ORDER

Plaintiff Robert Bulas, M.D. brings this ERISA action against Defendant
Provident Life and Accident Insurance Company[1] following its decision to terminate
benefits under a Provident-issued disability policy. (Compl., ECF No. 1.) The
Administrative Record was filed under seal (Admin. R., ECF No. 44) and the parties
filed cross-motions for judgment (ECF No. 52; ECF No. 53). Dr. Bulas and Provident
have each responded to the other's motion, and replied in support of their own.
(ECF Nos. 54, 55.)

For the reasons set forth below, Dr. Bulas's Motion for Judgment on the
Administrative Record (ECF No. 52) is **GRANTED** and Provident's (ECF No. 53) is
**DENIED**.

---

[1] Dr. Bulas originally filed his three-count complaint against UNUM Life
Insurance Company of America. (*See* Compl.) In an October 26, 2022 Opinion and
Order, this Court dismissed the first count and substituted Provident as the
defendant in counts two and three. Accordingly, Dr. Bulas's only remaining claims
are asserted against Provident.

## I.    FACTUAL BACKGROUND

In 1994, after completing his radiology[2] residency and neuroradiology[3] fellowship, Dr. Bulas began practicing with CINHIO Diagnostic Imaging, Inc., now known as Professional Radiology, Inc. (Admin R., PAGEID # 440, 444, 447, 629–33, 1598.) When Dr. Bulas joined the practice, CINHIO facilitated his purchase of a disability income policy from Provident (the "Policy"). (*See id.*, PAGEID # 617, 680.) In 2017, Dr. Bulas filed a claim for Total Disability benefits under the Policy, asserting that a vision impairment prevented him from working. Provident approved the claim. This lawsuit arises out of Provident's decision to terminate those benefits four years later.

### A.    Relevant Policy Terms

The Policy provides income benefits to policyholders who become Totally or Residually Disabled. (*See id.*, PAGEID # 677–701.) Totally Disabled means that, due to injury or sickness, "you [the policyholder] are not able to perform the substantial and material duties of Your Occupation." (*Id.*, PAGEID # 684.) Your Occupation means:

> the occupation (or occupations, if more than one) in which you are
> regularly engaged at the time you become disabled. If your occupation

---

[2] "A radiologist is a physician who uses imaging methodologies to diagnose and manage patients and provide therapeutic options." (Admin. R., PAGEID # 1755.)

[3] "A specialist in Neuroradiology diagnoses and treats disorders of the brain, sinuses, spine, spinal cord, neck, and the central nervous system, such as aging and degenerative diseases, seizure disorders, cancer, stroke, cerebrovascular diseases, and trauma. Imaging commonly used in Neuroradiology includes angiography, myelography, interventional techniques, and magnetic resonance imaging (MRI)." (Admin R., PAGEID # 1756.)

is limited to a board certified specialty, we will deem your specialty to
be Your Occupation.

(*Id.*) Residually Disabled means different things depending on whether the

disability occurs during or after the elimination period has been satisfied:

> Residual Disability or residually disabled, during the Elimination
> Period, means that due to Injuries or Sickness:
>
> 1. you are not able to do one or more of your substantial and
>    material daily business duties or you are not able to do your
>    usual daily business duties for as much time as it would
>    normally take you to do them; and
> 2. you have a Loss of Monthly Income in Your Occupation of at
>    least 20%.
>
> After the Elimination Period has been satisfied, you are no longer
> required to have a loss of duties or time. Residual Disability or
> residually disabled then means that as a result of the same Injuries or
> Sickness you have a Loss of Monthly Income in Your Occupation of at
> least 20%.

(*Id.*, PAGEID # 691.)

The Policy allows a policyholder to update their coverage in certain

circumstances. (*See id.*, PAGEID # 697–98.) In 2002, Dr. Bulas exercised one such

option, thereby amending the Policy. (*Id.*, PAGEID # 641–47.) The Increased

Benefit Amendment is signed by Provident's chief executive and provides that it

and the application for increased coverage, are "a part of" the Policy. (*Id.*, PAGEID

# 643.) Dr. Bulas's application provides:

> If coverage applied for qualifies as a benefit under an Employee
> Welfare Benefit plan established or maintained by the employer and
> governed by the Employee Retirement Income Security Act (ERISA),
> UnumProvident Corporation and its affiliates will be the claims
> administrator and have full, final, binding, and exclusive discretion to
> determine benefits. Pursuant to ERISA the policyholder will be
> entitled to appeal any claims decision.

(*Id.*, PAGEID # 645.) Dr. Bulas's signature immediately follows. (*Id.*)

**B.  April 2017 — Dr. Bulas developed serious ophthalmic issues**

Dr. Bulas's ophthalmic issues were first documented in 2011. (*Id.*, PAGEID # 660.) On March 31 of that year, Dr. Bulas presented to the Cincinnati Eye Institute complaining of "hazy" vision in his left eye. (*Id.*) Dr. Michael Snyder diagnosed vitreous condensates (referred to as "floaters") and posterior vitreous detachment in both eyes. (*Id.*, PAGEID # 590, 661.) Dr. Bulas opted for observation over surgery. (*Id.*, PAGEID # 590.) Though he continued to experience "frosted glass" vision due to the floaters, he "dealt with it at work by pausing . . . for seconds to a few minutes at a time, attempting to relieve [his] symptoms by shaking [his] head in order to attempt to move the floaters away from [his] central vision." (*Id.*) The "frequency and size of the floaters was noted to increase from 2015 to 2017," which caused him some difficulty in performing procedures and imaging. (*Id.*)

On April 14, 2017, Dr. Bulas experienced a sudden loss of vision in his right eye. (*Id.*, PAGEID # 590–91.) He was seen at the Cincinnati Eye Institute within an hour. (*Id.*, PAGEID # 523–26.) There, Dr. Matthew W. Manry determined that Dr. Bulas suffered a retinal detachment with multiple retinal tears and a posterior vitreous detachment in his right eye. (*Id.*) Dr. Bulas underwent surgery the next morning. (*Id.*, PAGEID # 521–22.)

On May 31, 2017, Dr. Bulas presented to Dr. Robert Hutchins for a post-operative evaluation. (*Id.*, PAGEID # 527–29.) Dr. Hutchins's treatment notes indicate that Dr. Bulas complained of diplopia (double vision) and "flutter." (*Id.*,

4

PAGEID # 527.) Though Dr. Hutchins reported that Dr. Bulas was "46 Days Excellent post op course," he did identify two "new retinal breaks . . . suggestive of early proliferative retinopathy (PVR)." (*Id.*, PAGEID # 529.) Dr. Hutchins further stated:

> Dr. Bulas is clearly visually impaired and should be considered totally disabled and unable to perform those tasks needing fine visual functioning such as those tasks performed as an interventional radiologist for a minimum of 8–12 months. The right eye currently suffers from metamorphopsia (image distortion) and degraded visual acuity resulting from his macula involving retinal detachment. The left eye suffers from large vitreous floaters/condensations causing reduced contrast sensitivity and blurred images. We can expect that it will take 1–2 years before all visual issues are settled. Unknowns at this time include 1. whether or not the image distortion [right eye] will improve over the next several months, 2. whether he'll develop progressive PVR [right eye] necessitating additional retinal surgery, 3. whether he'll need cataract surgery [right eye], and 4. whether vitrectomy surgery would be indicated to address the vitreous opacities in his left eye.

(*Id.*)

## C.    July 2017 — Provident approved Dr. Bulas's claim for Total Disability

Shortly after his surgery, Dr. Bulas filed a claim seeking disability benefits under the Policy. (*Id.*, PAGEID # 436.) Dr. Bulas described his impairment on the claim form as:

> Visual loss/distortion
> [Right] eye: Retinal tears/detachment → post-op
> [Left] eye: Posterior vitreous detachment/giant floaters

(*Id.*, PAGEID # 440.) He reported his symptoms as:

> 6 years of intermittent progression visual obscuration + partial visual loss; 4/14/17 [right] eye loss of vision

(*Id.*) Dr. Bulas reported that he could "drive in daylight" and "do physical labor," but that he could not "read on paper or write for more than several seconds at a time" or "focus on lit screens due to visual distortions causing dizziness." (*Id.*, PAGEID # 441.)

As to his occupation, Dr. Bulas listed his job title as "Radiologist; Neuroradiologist." (*Id.*, PAGEID # 444.) Dr. Bulas indicated that he worked 10-hour days, splitting his time between hospital and office settings. (*Id.*, PAGEID # 449.) He described his occupational duties as follows:

> **Duty** Diagnostic Imaging Radiologist
> **Hours Spent Each Week**     ~45
> **Description:** Interpretation of medical imaging studies on computer monitors, averaging 100 exams/day, including xrays, ultrasound, CT, and MRI exams
>
> **Duty** Interventional Radiologist + Neuroradiology
> **Hours Spent Each Week**     ~10–15
> **Description:** Performance of image guided procedures: angiography, arterial stenting, intraarterial embolization, kyphoplasty, myelography, epidural steroid injections

(*Id.*, PAGEID # 444.) Dr. Bulas described his workstation in a phone interview with the claims specialist:

> [H]e has 3 very large computer monitors and he sits with a dictophone [*sic*] in one hand and a computer mouse in the other and he scrolls to review the images and dictates into the phone.

(*Id.*, PAGEID # 666.) Dr. Bulas represented that he could no longer perform any of those duties: "As an imager/radiologist, I cannot accurately diagnose disease or perform procedures due to vision obscuration on [left] + distortions on [right]." (*Id.*, PAGEID # 441.) He further stated,

6

> I cannot focus on printed word or images on computer monitors due to
> visual distortions in [right] eye and intermittent blind spots in [left]
> eye; therefore, I cannot perform any of my duties accurately or safely.

(*Id.*, PAGEID # 444.)

Provident completed their own detailed vocational review on Dr. Bulas's file.

(*Id.*, PAGEID # 799–801.) Vocational consultant David Gaughan reviewed (i) CPT

codes for Dr. Bulas's billed services for the year preceding his vision loss, (ii) calls

and written correspondence between Provident and Dr. Bulas, (iii) Dr. Bulas's own

statements and Dr. Hutchins's Attending Physician Statement, and (iv) the

occupational description provided by Dr. Bulas. (*Id.*, PAGEID # 800.) After his

review, Mr. Gaughan concluded:

> Vocationally, insured's material duties consisted of Diagnostic
> Radiology (Representing 84% of all gross charges billed). Examples
> include the full scope of review & interpretation of X-Ray. CT (Head,
> neck, chest, abdomen etc. . ). MRI.
>
> Ancillary/Misc production included:
>
> Surgical Procedures (representing 10% of all gross charges billed).
> Examples include: Injection – Lumbar/Sacral. Fine needle Aspiration
> w/guidance. Needle biopsy of kidney. Injection for Myelogram/CAT SC.
>
> Diagnostic Ultrasound (representing 4% of all gross charges billed).
> Examples include Echo exam of retroperitoneal. Echo exam of
> abdomen, pelvis, transvaginal. Echo guidance for needle placement.
>
> Demands
>
> Visual Demands: Diagnostic reading/interpretation requires near
> acuity (i.e. clarity of vision at 20 inches or less), ability to discern
> differences in shape/shading/color. Binocular vision/depth perception
> (i.e. ability to judge distance & spatial relationships) is required when
> performing procedures.

(*Id.* (reproduced as written).)

On July 11, 2017, Provident approved Dr. Bulas's claim for Total Disability

benefits under the Policy. (*Id.*, PAGEID # 775–76.)

**D.    September 2018 — Provident found that Dr. Bulas remained Totally Disabled**

Dr. Bulas continued to see Dr. Hutchins. After a July 13, 2017 post-operative

appointment, Dr. Hutchins noted that Dr. Bulas "is doing well, but remains visually

impaired." (*Id.*, PAGEID # 831.) Two months later, Dr. Hutchins noted that Dr.

Bulas

> feels that he is slightly better. He no longer feels dizzy, nauseated, or
> off balance. He is able to read but has to go very slow. Images in the
> right eye still have a "tail." Vision in the left eye still has the large
> floaters that get in the way when trying to read. He still has difficulty
> driving at night.

(*Id.*, PAGEID # 832.) Dr. Hutchins also recommended that Dr. Bulas undergo yet

another retinal procedure—this time, to address lattice degeneration observed on

examination of his left eye. (*Id.*, PAGEID # 835.) The procedure was completed in

November 2017. (*Id.*, PAGEID # 893.)

On March 15, 2018, Dr. Bulas presented for a follow-up visit. (*Id.*, PAGEID

# 886–90.) Dr. Hutchins recorded his impression, in part, as follows:

> Visual functioning: Distortion is nearly gone. [Dr. Bulas] still has
> monocular and binocular diplopia (ask him to see strabismus
> specialist) and inferior field fluttering [right eye]. The double vision
> and reduced central vision [right eye] currently prevents him from
> being able to work. . . . Large Vitreous Floaters [left eye] contribute to
> visual difficulties.

(*Id.*, PAGEID # 890.) A short time later, Dr. Hutchins completed another Attending

Physician Statement, concluding that Dr. Bulas was:

> Unable to perform diagnostic imaging or image guided procedures due to monocular and binocular double vision, large floaters in the left eye, and blurred central vision in the right eye.

(*Id.*, PAGEID # 906.)

Dr. Bulas next saw Dr. Hutchins on July 12, 2018. (*Id.*, PAGID # 955.) At that visit, he recounted his experience with the strabismus (crossed eyes) specialist, Dr. Szmyd.[4] Dr. Hutchins recorded in his notes:

> The 54 year old male [Dr. Bulas] presents for 6 month retinal exam in the right eye for ERM and left eye for lattice and vitreous floaters. Patient states that there has been very little change in vision since his last exam. He saw Dr Szmyd. She said there was no muscle issues but they have trie[d] several "tricks" including wearing glasses for distance on a regular basis. Visual acuity has improved slightly but the eyes still feel "uncoordinated" or don't focus together. He has noticed a new spinning pinwheel in the area just above central vision in the right eye. It started about 3 months ago and only sees it in dimmer light and only when [blood pressure] is elevated, such as when he is jogging or working in the yard. Floaters in the left eye are the same.

(*Id.*) Following examination, Dr. Hutchins concluded, in part:

> Visual functioning. Distortion is nearly gone. He still has monocular and binocular diplopia. His [visual acuity] is better with new [prescription]. He reports new "pinwheel" symptom in central VA [right eye] when [heart rate] increases. The double vision and reduced central vision [right eye] currently prevents him from being able to work. . . . Large Vitreous Floaters [left eye] contribute to visual difficulties.

(*Id.*, PAGEID # 959.)

With these medical records in-hand, Provident reviewed Dr. Bulas's claim file in September 2018. (*See id.*, PAGEID # 983–84.) Provident concluded that Dr. Bulas

> is improving, but very slowly. His [restrictions and limitations] remain supported as reported by his [attending physician]—double vision,

---

[4] The record includes a one-page treatment note from Dr. Szmyd. (Admin. R., PAGEID # 978.) It is largely illegible.

large floaters and blurred central vision—which preclude his ability to
work in his [occupation].

(*Id.*, PAGEID # 984.)

### E.    April 2019 —Provident determined that Dr. Bulas had a "poor" likelihood of ever returning to work

During a January 17, 2019 visit with Dr. Hutchins, Dr. Bulas reported that

his eyes were "stable," with "no changes since [his] last visit." (*Id.*, PAGEID # 994.)

He also reported continued issues with "giant floaters" in his left eye and the

"pinwheel" in his right. (*Id.*) Dr. Bulas indicated that he had difficulty reading small

print. (*Id.*) Dr. Hutchins's notes reflect:

Patient is having increasing trouble with reading. His other visual
symptoms are unchanged.

(*Id.*, PAGEID # 998.)

In mid-March, Dr. Hutchins completed his third Attending Physician

Statement:

Distortion in right eye is almost gone but still has blurriness centrally
making reading difficult. Monocular and binocular double vision. Large
floaters in the left eye. Inferior visual field fluttering in the right eye.

. . .

Unable to perform duties such as diagnostic imaging or image guided
procedures due to monocular and binocular double vision, large
floaters in the left eye, and blurred central vision of the right eye
making reading small print difficult.

(*Id.*, PAGEID # 1013–14.) The following month, a Provident claims specialist

interviewed Dr. Bulas. (*Id.*, PAGEID # 1026–27.) Dr. Bulas advised "as far as a

retinal standpoint he is stable" but "his vision is worse" in his right eye due to a

growing cataract. (*Id.*) He planned to see a lens specialist to determine whether

10

surgery was necessary. (*Id.*) He reported that he continued to struggle with double vision, but could read through the double vision and cataract symptoms when using a magnifying glass in the proper light conditions. (*Id.*) Dr. Bulas then described going on a two-week volunteer medical mission to Panama. (*Id.*) He prepared for the mission by studying audio lessons on tropical medicine and Spanish language. (*Id.*) He reported that "he did OK" because "he had back up." (*Id.*)

In an April 26, 2019 file review, Provident determined that Dr. Bulas "is not getting better and will likely only worsen [with] time barring surgery" and that the likelihood Dr. Bulas would return to work in his own occupation "seems poor even [with] surgery." (*Id.*, PAGEID # 1028.)

### F.    September 2019 — Provident transferred Dr. Bulas's claim

Dr. Bulas next saw Dr. Hutchins on July 25, 2019. (*Id.*, PAGEID # 1049.) Following examination, Dr. Hutchins stated:

> Patient is having increasing trouble with his vision. The floaters in his left eye are hanging over his macula and constantly affect with [*sic*] his vision. The cataract is worsening in his right eye.

(*Id.*, PAGEID # 1053.)

Provident reviewed Dr. Bulas's claim file again in September 2019, with a clinical consultant and on-site physician ("OSP"). (*Id.*, PAGEID # 1093.) The claim file states:

> OSP notes that significant improvement in [Dr. Bulas's] vision to enable him to [return to work] is not expected. Even if [Dr. Bulas] were to have cataract surgery on his [right] eye, given the nuclear sclerosis of same, vision would not improve to enable [him] to perform his visual [occupational] demands as noted by [the vocational consultant].

11

(*Id.*) Based on this conclusion, Provident transferred Dr. Bulas's claim to their

Special Benefits unit. (*Id.*, PAGEID # 1096.)

### G.    August 2021 — Provident terminated Dr. Bulas's benefits on the grounds that he could now perform diagnostic radiology

On November 19, 2019, Dr. Michael Snyder performed a cataract extraction

on Dr. Bulas's right eye. (*Id.*, PAGEID # 1145.) The surgery was successful. (*See id.*,

PAGEID # 1205–07.) Dr. Bulas reported that the visual symptoms associated with

the cataract had resolved, but the double vision and floaters remained. (*Id.*)

On January 16, 2020, Dr. Bulas saw Dr. Hutchins for a follow-up. (*Id.*,

PAGEID # 1197–1202.) Dr. Hutchins recorded the following in his treatment notes:

> [Dr. Bulas] states he received cataract surgery a couple months ago in
> [right eye] and it has increased his acuity. [He] states the double vision
> is gone in [right eye]. [He] states [left eye] is stable, with no changes.
> [Dr. Bulas] states he still has the floaters in [left eye] that blocks [*sic*]
> his vision.

(*Id.*, PAGEID # 1197.) During that visit, Dr. Bulas decided to move forward with a

vitrectomy—surgery that would attempt to remove the floaters. (*Id.*, PAGEID

# 1200–01.) Dr. Hutchins performed the procedure on May 7, 2020. (*Id.*, PAGEID

# 1146–47.) At a three-month post-operative evaluation, Dr. Hutchins noted simply

that Dr. Bulas was "[d]oing well." (*Id.*, PAGEID # 1180.)

In March 2021, Provident reached out to Dr. Bulas and Dr. Hutchins for

updated information. On his Individual Statement, Dr. Bulas indicated that his

medical condition had not changed since he last provided information:

> I did have another eye surgery in the last year on my [left] eye, a
> vitrectomy. While it removed my [left] eye floaters, it didn't change my
> double vision, etc.

12

(*Id.*, PAGEID # 1169.) As to his day-to-day activities, Dr. Bulas stated:

> Household chores, exercise, grocery shopping; no reading still except
> short emails + texts due to double vision/uncoordinated vision +
> artifacts in [right] eye.

(*Id.*)

On his Attending Physician Statement, Dr. Hutchins also indicated that Dr.

Bulas's medical condition had not changed. (*Id.*, PAGEID # 1288.) He further

indicated that Dr. Bulas's prognosis for improvement was poor. (*Id.*) As to his

specific limitations, Dr. Hutchins stated:

> [Dr. Bulas] is unable to perform tasks such as diagnostic imaging or
> image guided procedures due to diplopia and uncoordinated vision. He
> has a spinning image centrally and a fluttering image in inferior vision
> of the right eye.

(*Id.*)

In April 2021, Provident decided to review Dr. Bulas's file, noting that "there

seems to have been some improvement in" Dr. Bulas's visual acuity. (*Id.*, PAGEID

# 1328.) In connection with that effort, Provident OSP Dr. Joseph A. Antaki spoke

with Dr. Hutchins about Dr. Bulas's condition. (*Id.*, PAGEID # 1461.) Dr. Antaki

summarized their May 10, 2021 conversation in a letter to Dr. Hutchins:

> Thank you for speaking with me today regarding the
> restrictions/limitations for Dr. Bulas. As you know, Dr. Bulas
> continues to report disturbances involving the vision of his right eye,
> including a description of an obscuring "spinning wheel" when his
> heart rate increases, and episodes of vertical diplopia. I needed to gain
> a better understanding of the limitations related to his visual
> symptoms. Today, you clarified the following:
>
> Though Dr. Bulas had a successful repair of his retinal detachment on
> the right, it did involve the macula; in such cases fluid can migrate
> under the fovea. You have identified some wrinkling of the retina.
> Distortion of images can be common in these situations, and may never

resolve completely. There may not be physical exam findings of the eye that correlate with the reported symptoms.

The left eye has better vision for fine detail at this point, though Dr. Bulas is developing a cataract in that eye. Whether someone is able to function without limitation with a disruption in the coordination of the image between the two eyes is person dependent.

(*Id*.)

On June 14, 2021, Dr. Bulas saw Dr. Hutchins for a follow-up. Dr. Hutchins

wrote:

The 57 year old male presents for evaluation of 10mo floaters [follow-up] in the left eye. [Dr. Bulas] states that his vision has remained the same since last visit. He has adjusted to primarily using [left eye] and is overall happy with his vision.

(*Id*., PAGEID # 1465.)

After receiving the June 14, 2021 notes, Dr. Antaki ordered a consult on Dr.

Bulas's file from Dr. Richard Eisenberg. (*Id*., PAGEID # 1502.) Following a full

review of medical records, Dr. Eisenberg responded to the questions posed by Dr.

Antaki:

**1. Is the insured's report of intermittent disruption of the vision in the right eye (i.e. "spinning wheel") with activity consistent with the conditions the insured has been treated for (retinal detachment involving fovea with "wrinkling") and the subsequent exam findings?**

There is no obvious or clear explanation for the insured's persistent symptoms of "spinning wheel" visual phenomenon associated with activities causing a higher heart rate, and there are no correlating physical examination findings present with such intermittent occurrences. I do find the insured's self-reported symptoms credible, however, as such unexplained visual observations are not uncommon [in] the setting of previous derangements involving the retina or optic nerve; vascular perfusion factors may be invoked as well. Previous damage to ocular nervous tissue such as the sensory retina and optic

14

nerve may result in residual visual phenomena even in the presence of anatomic improvement of previously noted pathology.

## 2. Is there information in the file to explain the insured's reports of diplopia?

There is more evidence in the file to support the presence of monocular diplopia than binocular. Monocular diplopia is a common result of previous macula-off [retinal detachment] surgery, especially with a resulting ERM, as noted in the insured. Several Amsler grid tests were described as abnormal, with metamorphopsia and "double lines" a very common observation in those with ERM. The most recent examinations, however, indicate that the insured reported less monocular diplopia with recovery of visual acuity s/p phacoemulsification to 20/20 [right eye] (prior to the development of posterior capsule opacification); the last macular OCT was also read as normal by Dr. Hutchins on 6/14/21. This raises the question as to the level of continued visual impairment [right eye].

The presence of binocular diplopia is more difficult to corroborate with evidence in the medical records. The (barely legible) record of Dr. Szmyd detailed more monocular than binocular diplopia, and there is no evidence that prism treatment was initiated. Dr. Snyder described full extraocular motility with a "tiny flick exotropia" that he linked with the insured's report of binocular diplopia. No follow-up with a strabismus specialist or further attempts at glasses with prism correction were pursued, even in the presence of improved vision in both eyes individually. The presence of binocular diplopia by both Dr. Hutchins and Dr. Snyder appears to be based more on the insured's self-reported symptoms than examination findings.

## 3. Is there any other testing that would be indicated to evaluate the insured's reported visual complaints involving the right eye?

Yes, there are several testing parameters that would be indicated. A more recent Amsler grid exam would corroborate his report that his near function is "more dominant" with his left eye due to persistent metamorphopsia in the right eye. This was reported in earlier visits but has not been reported coincident with the insured's improvement in [visual acuity] after cataract surgery. A formal stereopsis test would also be helpful in determining the degree of depth perception, as this is one of the occupational requirements noted by [the vocational consultant]. Fluorescein angiography or OCT angiography could

identify vascular perfusion abnormalities [right eye] that may substantiate the visual complaints in this eye as well.

**4. Is the insured's eye condition consistent with the reported inability to meet the occupational visual demands as outlined by the [the vocational consultant]?**

I opine that this is currently indeterminate due to the above considerations. With the improvement of [visual acuity] [right eye] (after cataract surgery to 20/20, notes indicating less monocular diplopia, and most recent macular OCT read as normal) and [left eye] (after vitrectomy surgery), it is possible that the insured's overall visual functional capacity would fulfill the occupational visual requirements. As noted above, the most recent supportive data for ongoing total disability is less compelling; the above testing suggestions would assist in this determination.

At the present time, it appears as if the insured would be able to perform visual tasks that do not require stereopsis [(depth perception)], i.e. diagnostic Radiology, based on the function of his left eye alone. The most recent [visual acuity left eye] of 20/25-2 should suffice for frequent near acuity. However, the performance of interventional Radiology, which requires depth perception, is more nebulous due to the lack of recent supporting data. If subsequent information is received that documents the presence of continued metamorphopsia [right eye] with Amsler grid reports, and/or impaired stereopsis (80 seconds of arc or greater), and/or macular vascular abnormalities [right eye], this would support the presence of [restrictions and limitations] pertaining to duties requiring depth perception. If so, the impairment would be expected to be permanent. I will be available to review and comment on this information if it becomes available.

(*Id.*, PAGEID # 1504–05.)

Provident's file review team then asked Dr. Hutchins whether additional testing was being considered. (*Id.*, PAGEID # 1520.) Dr. Antaki summarized his response:

Though the vision in the left eye is unencumbered by distortion or floaters, you would not be able to attest to whether intact acuity of one eye is an acceptable standard to allow the practice of diagnostic

16

radiology/neuroradiology. You do not know if that is information that the Academy of Radiology could comment on.

In regards to Dr. Bulas' intermittent distortion of the vision in the right eye, though tests of stereopsis and further Amsler grid testing could be done, these are tests of "gross function." You would still have to consider as credible Dr. Bulas' report that this disturbance is impairing and is similar to what a few other patients have reported who have had a similar disturbance of the macula.

(*Id.*, PAGEID # 1521.) Following this conversation, Dr. Antaki concluded that the medical records no longer supported that Dr. Bulas was unable to perform activities that did not require stereopsis (depth perception). (*Id.*, PAGEID # 1529.)

To resolve the conflicting opinions between Dr. Hutchins (who believed, per his Attending Physician Statement, that Dr. Bulas was unable to perform his occupation) and Dr. Antaki (who believed that the records no longer supported restrictions on performing diagnostic radiology), Provident referred Dr. Bulas's file for medical reviews by OSP Dr. Eisenberg and Designated Medical Officer Dr. Sami Kamjoo. (*Id.*, PAGEID # 1531.) Both Dr. Eisenberg and Dr. Kamjoo agreed with Dr. Antaki. Dr. Eisenberg concluded:

I agree with Dr. Antaki's determination that the insured retains the visual functional capacity to perform the duties of his occupation that do not require stereopsis. Using the VRC guidelines, the visual requirements for diagnostic reading/interpretation include near acuity and ability to discern differences in shape/shading/color. On the insured's last examination with Dr. Hutchins on 6/14/21, the [visual acuity] in the left eye alone (20/25-2) satisfies these conditions, and there is no evidence of a disturbance in color vision. Diagnostic readings occur on a 2-dimensional surface and do not require stereopsis. If the distortion or a double image in one eye is deemed to "interfere" with the other, it could be adequately suppressed with fogging techniques or the use of a Bangerter filter. However, it was clearly stated by Dr. Hutchins that the insured "has adjusted to primarily using [left eye] and is overall happy with his vision" on his last examination. It appears that Dr. Hutchins' reluctance to provide

17

agreement with Dr. Antaki's suggestion that diagnostic testing could be adequately performed monocularly is more based on his unfamiliarity with Vocational requirements than abnormal examination findings. Notably, Dr. Hutchins indicated on the most recent [attending physician] contact that the insured's present vision [left eye] "is unencumbered by distortion or floaters." The last macular OCT was read as normal, and a significant cataract [left eye] (a common development post-vitrectomy) had not yet developed.

As an aside, I do find credible Dr. Hutchins' assertion that despite recovery of [visual acuity] [right eye] to 20/20 post [retinal detachment] repair and subsequent cataract surgery, it is common to experience residual metamorphopsia and/or monocular diplopia that can permanently degrade the degree of visual functioning in the affected eye. Indeed, there were several post-[retinal detachment] repair documentations of an abnormal Amsler grid [right eye], and this is a test that rarely completely normalizes over time. Despite the lack of more recent Amsler grid testing or formal stereopsis determination, I agree that activities that require stereopsis are likely to be permanently compromised in the insured.

(*Id.*, PAGEID # 1533.) Dr. Kamjoo also agreed with Dr. Antaki:

The available medical records and clinical exam findings support [Dr. Antaki's] opinion that [Dr. Bulas's] functional vision as documented in the most recent records do not support restrictions/limitations precluding activities that do not require stereopsis. The Insured has undergone successful retinal detachment repair right eye and vitrectomy left eye for vitreous floaters. The original retinal detachment did involve the macula, which can lead to residual monocular visual disturbances and distortion. However, on the most recent Ophthalmology evaluation (6/14/2021), the Insured had visual acuity of 20/40 right eye and 20/25 left eye, which supports that the Insured is able to read 2-dimensional diagnostic images that do not require stereopsis. There is intact visual fields bilaterally by confrontation visual field testing. Optical coherence tomography testing demonstrates normal retinal contour both eyes without cystoid macular edema. Slit lamp exam and dilated fundus exam has been stable per the available medical records. The treating retinal specialist has noted that [Dr. Bulas] has adjusted to primarily using left eye and is overall happy with his vision.

In summary, I agree with [Dr. Antaki's] opinion that the evidence in available medical records does not support restrictions/limitations precluding activities that do not require stereopsis.

18

(*Id.*, PAGEID # 1539–40.)

After Drs. Eisenberg and Kamjoo rendered their opinions, Provident sought to confirm whether the substantial and material duties of Dr. Bulas's occupation required stereopsis. (*Id.*, PAGEID # 1543.) Vocational consultant Robert J. Rodecker reviewed Dr. Bulas's claim file. He first noted that medical reports indicate that Dr. Bulas "retains the visual functional capacity to perform duties of his occupation that do not require stereopsis." (*Id.*, PAGEID # 1544.) He then noted that the August 2017 vocational review determined that Dr. Bulas's "material duties consisted of Diagnostic Radiology which represent[ed] 84% of all gross charge billed" and that "surgical procedures represented 10% of all gross charges billed." (*Id.*) "Based on review of CPT coding" and the August 2017 vocational review, Mr. Rodecker concluded that "the important duties of [Dr. Bulas's] occupation included diagnostic reading and interpretation of x-rays." (*Id.*) He then applied the visual demands first identified in August 2017 to conclude:

> [Dr. Bulas] can perform the work duties of a Diagnostic Radiologist interpreting films/writing reports which he had performed prior to date of claim. These positions exist in Hospitals as well as "Work from Home" opportunities also known as Teleradiologist. Opportunities also exist for "Remote Evening General Radiologists".

(*Id.*, PAGEID # 1556.)

On August 18, 2021, Provident sent a letter to Dr. Bulas explaining that the company no longer considered him Totally Disabled and was terminating his benefits. (*Id.*, PAGEID # 1566–72.) The letter summarized the medical records, along with the conclusions of Dr. Antaki, Dr. Eisenberg, Dr. Kamjoo, and Mr.

Rodecker. (*Id.*) It then advised Dr. Bulas that Provident did not consider him

eligible for Total Disability or Residual Disability benefits under the Policy:

> We have determined you are able to perform the substantial and
> material duties of a diagnostic radiologist, which was the dominant
> portion of your pre-disability occupation. Therefore, you do not qualify
> for Total Disability benefits. . . .

> Although you have not claimed Residual Disability/Recovery Benefits,
> we wish to advise you that you would not qualify for these benefits.
> Residual Disability requires that you incur a loss of monthly income in
> your occupation of at least 20 percent, because of disability. As you are
> not working at all in your occupation, though you could do so, you
> cannot satisfy this requirement. . . .

(*Id.*, PAGEID # 1569–70.)

## H.     November 2021 — Dr. Bulas appealed Provident's benefit determination

On November 4, 2021, Dr. Bulas appealed Provident's non-disability

determination. (*Id.*, PAGEID # 1592.) In support of his appeal, Dr. Bulas attached:

two statements that he prepared; statements from Dr. Raymond C. Rost, Jr. and

Dr. Robert J. Ernst; an email from Joe Woods at Marsh McLennan Agency; and the

American Board of Medical Specialties' 2020 Guide to Medical Specialties. (*See id.*)

Dr. Bulas argued that Provident erred when it concluded that (i) his

occupation was Diagnostic Radiologist, and (ii) he could perform diagnostic

radiology. (*Id.*, PAGEID # 1592–93.) As to the first error, Dr. Bulas argued that the

CPT code analysis improperly led Provident to determine that interventional

procedures were not a substantial and material duty of his occupation. (*Id.*,

PAGEID # 1595 (citing *McCann v. Unum Provident*, 907 F.3d 130 (3d Cir. 2018).)

Dr. Bulas next argued that he could not perform diagnostic work using only his left eye, largely due to the resulting strain and fatigue. (*Id.*) Dr. Rost's statement offers an account of a radiologist's vocational requirements:

> A Radiologist in private practice will interpret a variety of imaging studies. These imaging studies include Xray or plain radiography, advanced cross-sectional imaging studies (CT, MRI, PET Metabolic imaging), nuclear medicine studies, and interventional procedures of varying types and complexities. In the course of a ten-hour workday in our practice, a radiologist will interpret between 75 and 125 imaging studies. The viewing and the interpretation of these imaging studies is performed on sophisticated computer workstations employing multiple high-resolution monitors. These workstations also include dictation hardware and software for the immediate generation of final imaging reports. Xray or plain radiography studies usually have up to 5 images; each image is reviewed on a computer monitor. Following review, a report is generated. The total time spent would be less than 5 minutes. Cross-sectional imaging studies such as CT or MRI contain hundreds to thousands of images. These studies consist of multiple series of images; each series of images needs to be reviewed by scrolling through the images on the computer workstation. An individual series of images may take less than 1 minute up to many minutes to review. A basic non-contrast head CT will consist of hundreds of images. A Radiologist should be able to review a head CT study and generate a report in less than 5 minutes. The majority of CT and MRI studies contain many more images and series than a non-contrast head CT. I have interpreted complex CT Angiography studies containing 7000 images. Interpretation of more complex CT and MRI may take up to 30 minutes. Interpretation of these studies requires extensive scrolling through each series of images. Each individual image needs to be reviewed. On each image, there are a myriad of normal and potentially abnormal structures that must be rapidly visually scanned and focused upon, and as one scrolls from image to image, constant refocusing and scanning with high visual acuity is required. Visual acuity and constant focus is crucial to the perception and detection of imaging abnormalities/findings. A Radiologist must be able to detect abnormal findings measuring 1mm or greater in size. For example, sub-centimeter pulmonary nodules or small pulmonary emboli need to be detected on chest CT studies. Failure to perceive an abnormality may lead to a delay in diagnosis and potential harm to the patient. Failure of perception is the most common cause of Radiology malpractice suits.

21

(*Id.*, PAGEID # 1613.) In his own statement, Dr. Bulas explains why he believes he

is unable to perform such tasks:

> . . . I am unable to cover my right eye and read the stationary written
> word with my left eye alone for more than a couple minutes without
> developing debilitating eye strain, fatigue, and headache. To suggest
> that I can accurately scan and accurately interpret hundreds of images
> on even one exam with my left eye alone, and then repeat that process
> again and again and again is absurd, given my extreme limitations
> with even the stationary written word. I cannot accurately interpret a
> handful of images with my left eye alone, let alone one entire imaging
> study of one patient.
>
> . . .
>
> Read an eye chart with my right eye covered? Yes, with a little time
> and a lot of effort. Read even 1 complex radiological imaging exam
> accurately, let alone the 80–120 required a day to be a practicing
> radiologist? No chance.

(*Id.*, PAGEID # 1604, 1606.) Dr. Bulas further contends that, due to his visual

impairment, he would be unable to obtain liability insurance or facility privileges to

practice radiology. (*See id.*, PAGEID # 1614, 1634.)

## I.    January 2022 — Provident denied Dr. Bulas's appeal

Provident first sent Dr. Bulas's appeal to vocational consultant Shannon

O'Kelley to determine whether the materials provided "alter the conclusions of the

visual requirements of the performance of the material and substantial duties of"

Dr. Bulas's occupation. (*Id.*, PAGEID # 1763.) Mr. O'Kelley first summarized the

vocational portions of the claim history, including Dr. Bulas's occupational

description and Provident's CPT code analysis. (*Id.*) He then summarized the

arguments and materials submitted on appeal. (*Id.*, PAGEID # 1764–65.) Mr.

O'Kelley copied portions of Dr. Bulas's statements into his report. (*Id.*) As to the

other documents submitted, however, Mr. O'Kelley stated:

> The appeal also contained the opinion of the visual requirements of
> Diagnostic and International Radiologists from two physicians which.
> The appeal also included an email indicating that the insured is
> uninsurable based on his visual deficits.

(*Id.*, PAGEID # 1765 (reproduced as written).) Mr. O'Kelley then stated his

conclusion:

> The vocational reviews presented the information provided within the
> billing. The billing showed that the insured performed Diagnostic and
> Interventional Radiology. Per the insured in the Occupational
> Description, Interventional Radiology accounted for about 25% of his
> reported work week. Per the billing analysis, the Surgical Procedures
> accounted for about 3% of billing and 10% of the charges and
> Diagnostic Radiology accounted for about 84% of the billing and 84% of
> charges. The additional information does not alter that the visual
> requirements of near acuity (clarity of vision at 20 inches or less) and
> ability to discern differences in shape/shading/color when performing
> Diagnostic procedure with the addition of binocular vision/depth
> perception (ability to judge distance & spatial relationships) for
> performing Interventional procedures.

(*Id.*)

Dr. Bulas's appeal was then sent for medical review to determine whether

"the medical and file documentation reviewed support [restrictions and limitations]

due to [Dr. Bulas's] vision conditions in the left and right eyes that would preclude

him from performing the visual demands of his occupation[.]" (*Id.*, PAGEID # 1768.)

Dr. Clifford Michaelson completed his review on December 13, 2021. (*Id.*, PAGEID

# 1772.) Based on Dr. Bulas's claim file, Dr. Michaelson opined that Dr. Bulas:

> should be able to perform the tasks of a diagnostic radiologist requiring
> clarity of vision at 20 inches or less and the ability to discern
> differences in shapes, shading, and color, using the vision of his left eye
> alone (if he found this more comfortable, less distracting).

23

. . .

> Dr. Bulas also wrote in his appeal that he cannot use his left eye for more than a couple of minutes without developing debilitating eye strain, fatigue, and headache. Given Dr. Hutchins's examination findings of 6/14/21, I can find no medical basis for why these symptoms should occur.  . . .
>
> Finally, while there is no question that Dr. Bulas's profession requires visual precision and careful attention to detail, in my opinion, based on the medical records provided for my review, it appears that from 6/14/21 going forward that Dr. Bulas should be able to meet the minimal visual requirements as outlined by the [vocational consultant] for working as a diagnostic radiologist.

(*Id.*, PAGEID # 1774–75.)

Provident notified Dr. Bulas of its decision on appeal in a letter dated

January 3, 2022. (*Id.*, PAGEID # 1789–96.) The letter concludes, in relevant part:

> The medical and file documentation reviewed supports [Dr. Bulas's] visual conditions would preclude him from performing occupational demands associated with depth perception/stereopsis which includes interventional radiology procedures.
>
> However, the medical and file documentation reviewed does not support [Dr. Bulas's] visual conditions would restrict or limit [him] from performing occupational demands that do not require depth perception/stereopsis including diagnostic radiology. Since [Dr. Bulas] is capable of performing diagnostic radiology which accounted for a significant portion of his pre-disability billings and charges (84%), [he] is not Totally Disabled and he is not eligible for Total Disability benefits.

(*Id.*, PAGEID # 1792.) Provident noted that it would, however, consider his

eligibility for Residual Disability benefits. (*Id.*) It then responded to the issues

raised in Dr. Bulas's appeal:

> The occupational information reviewed supports [Dr. Bulas] worked as a radiologist prior to disability with 84% of pre-disability billing and charges accounting for diagnostic radiology. While [he] reports interventional radiology accounted for about 25%-35% of his time, this

is only based on [Dr. Bulas's] reports and is not consistent with the CPT data which reflects surgical procedures accounted for about 3% of billing and 10% of the charges.

We do not dispute that [Dr. Bulas] performed interventional radiology procedures prior to disability, however, diagnostic radiology accounted for a significant portion of billing and charges prior to disability. Further, while you dispute the classification of [his] occupation and assert [he] was working as an interventional radiologist; [Dr. Bulas] did not solely perform interventional radiology prior to disability and the information you provided does not change the visual demands required of [his] occupation.

(*Id.*, PAGEID # 1793.)

After receiving Provident's decision on appeal, Dr. Bulas filed the instant action.

## II.     STANDARD OF REVIEW

ERISA benefit determinations are reviewed *de novo* unless the plan expressly grants its administrator or fiduciary discretionary authority "to determine eligibility for benefits or to construe the terms of the plan." *Firestone Tire and Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989). If a plan grants discretionary authority, "application of the highly deferential arbitrary and capricious standard of review is appropriate[.]" *Yaeger v. Reliance Std. Life Ins. Co.*, 88 F.3d 376, 380 (6th Cir. 1996). Here, the parties disagree about whether *de novo* or arbitrary and capricious review applies. Because the Increased Benefit Amendment gives Provident "full, final, binding, and exclusive discretion to determine benefits,"

(Admin. R., PAGEID # 645), the Court proceeds under the arbitrary and capricious standard.[5]

"A decision reviewed according to the arbitrary and capricious standard must be upheld if it results from 'a deliberate principled reasoning process' and is supported by 'substantial evidence.'" *Schwalm v. Guardian Life Ins. Co. of Am.*, 626 F.3d 299, 308 (6th Cir. 2010) (quoting *Baker v. United Mine Workers of Am. Health & Ret. Funds*, 929 F.2d 1140, 1144 (6th Cir. 1991)). As the Sixth Circuit points out, this test has both a substantive component (substantial evidence) and a procedural one (deliberate and principled reasoning process). *Autran v. Procter & Gamble Health and Long-Term Disability Benefit Plan*, 27 F.4th 405, 411 (6th Cir. 2022). Substantial evidence exists "if a rational person could conclude that the evidence was adequate to justify the decision." *Id.* at 412 (internal quotation and citation omitted). Though a deliberate, principled reasoning process is not so easy to define, courts often ask questions like:

> Did the administrator consider all the evidence or overlook evidence that cut the other way? If the administrator departed from its earlier benefits ruling, did it adequately explain the change? If the Social Security Administration found that the participant was disabled under federal law, did the administrator consider this ruling? If the administrator credited certain doctors over others, did the credited doctors undertake a mere "file" review or conduct a thorough in-person

---

[5] The Policy provides that "[n]o change [to it] will be effective until approved by one of [Provident's] officers." (Admin. R., PAGEID # 701.) Dr. Bulas argues that the application for increased benefits "does not constitute a validly adopted amendment to the" Policy because it is signed only by him, and not by a Provident officer. (ECF No. 54, PAGEID # 1973.) But the Increased Benefit Amendment, which expressly incorporates the application, is signed by Provident's President and CEO. The Amendment is a clear grant of discretion, triggering review under the arbitrary and capricious standard. *Perez v. Aetna Life Ins. Co.*, 150 F.3d 550, 555 (6th Cir. 1998) (*en banc*).

evaluation? And did the administrator have a conflict of interest that affected its decision?

(*Id.*) (collecting cases). Accordingly, though deferential, arbitrary and capricious review is no "rubber stamp"—rather the court examines the "quantity and quality of the . . . evidence on each side." *Schwalm*, 626 F.3d at 308 (citing *Evans v. UnumProvident Corp.*, 434 F.3d 866, 876 (6th Cir. 2006)). If, following such review, "it is possible to offer a reasoned explanation, based on the evidence, for a particular outcome, that outcome is not arbitrary or capricious." *Shields v. Reader's Digest Ass'n, Inc.*, 331 F.3d 536, 541 (6th Cir. 2003) (quoting *Davis v. Kentucky Fin. Cos. Ret. Plan*, 887 F.2d 689, 693 (6th Cir. 1989)).

## III.  ANALYSIS

Dr. Bulas first argues that Provident improperly strayed from the Policy language when it terminated his Total Disability benefits. It is "a fundamental principle of ERISA law—the plain language of the plan controls." *West v. AK Steel Corp. Retirement Accumulation Pension Plan*, 318 F. Supp. 2d 579, 585 (S.D. Ohio 2004) (Beckwith, J.) (citation omitted). Accordingly, the Court's "starting point is the language of the [Policy] itself." *Farhner v. United Transp. Union Discipline Income Prot. Program*, 645 F.3d 338, 343 (6th Cir. 2011). The Policy provides that an insured is Totally Disabled if

> you are not able to perform the substantial and material duties of Your Occupation.

"Your Occupation" is then defined as

> the occupation (or occupations, if more than one) in which you are regularly engaged at the time you become disabled. If your occupation

27

is limited to a board certified specialty, [Provident] will deem your specialty to be Your Occupation.

Dr. Bulas takes issue with Provident's conclusion that he "was able to perform the substantial and material duties of a diagnostic radiologist, which was the dominant portion of [his] pre-disability occupation." First, he notes that the Policy gives no meaning to the "dominant portion" of an occupation. And second, he argues that the termination of benefits was inappropriate because interventional radiology was also a substantial and material duty of his occupation—and everyone agrees that he cannot perform interventional radiology.

Provident first responds that it was reasonable to use language like "dominant," which is a synonym of substantial and material. Provident next argues that Total Disability benefits are only available to policyholders who cannot perform *any* of the substantial and material duties of their pre-disability occupation—and because Dr. Bulas could perform at least one such substantial and material duty, he was not Totally Disabled. Provident further notes that, in response to Dr. Bulas's appeal, it agreed to consider his eligibility for Residual Disability benefits, which are available to policyholders who can perform *some but not all* of the substantial and material duties of their pre-disability occupation.[6]

---

[6] Inherent in Provident's argument is an acknowledgement that interventional radiology was a substantial and material duty of Dr. Bulas's pre-disability occupation. Accordingly, Dr. Bulas's argument based on *McCann v. Unum Provident*, 907 F.3d 130 (3d Cir. 2018) (holding that Unum Provident was wrong to disregard Dr. McCann's pre-disability interventional duties based on a CPT code analysis alone) is inapposite.

28

Provident's interpretation of the Total, versus Residual, Disability provisions of the Policy is reasonable and, thus, entitled to the Court's deference. *See A.G. by and through N.G. v. Cmty. Ins. Co.*, 363 F. Supp. 3d 834, 839 (S.D. Ohio 2019) (Black, J.) ("A health benefit plan 'should be read to give effect to all its provisions and to render them consistent with each other.'") (quoting *Gallo v. Moen Inc.*, 813 F.3d 265, 270 (6th Cir. 2016)).  So, although Provident erred in first determining that Dr. Bulas was not entitled to Residual Disability benefits, its decision on appeal was—at least in this regard—not arbitrary and capricious.

Dr. Bulas next argues that Provident incorrectly identified the functional visual requirements for diagnostic radiology. From the first vocational review, Provident applied the following visual demands for diagnostic radiology to Dr. Bulas's claim:

> Diagnostic reading/interpretation requires near acuity (i.e. clarity of vision at 20 inches or less), ability to discern differences in shape/shading or color.

Dr. Bulas argues that this is an inappropriate standard—indeed, that "there is a world of difference between being able to read an eye chart and being able to perform diagnostic radiology." (ECF No. 54, PAGEID # 1981.) Dr. Bulas offered his own statement and Dr. Rost's statement to support his assertion on appeal that visual acuity, alone, provides an incomplete representation of the visual demands on a diagnostic radiologist. Dr. Bulas and Dr. Rost agree that, in addition to visual acuity, some level of endurance is necessary to perform in the occupation—and that element is missing from Provident's analysis. Provident submitted Dr. Bulas's appeal materials to its vocational consultant, Mr. O'Kelley. Mr. O'Kelley's report

29

reflects that he considered Dr. Bulas's statement as "additional vocational information," but contains only a truncated half-sentence as to Dr. Rost's statement. (Admin. R., PAGEID # 1765 ("The appeal also contained the opinion of the visual requirements of Diagnostic and International [*sic*] Radiologists from two physicians which.").) The report then abruptly concludes that the information submitted on appeal "does not alter" the visual requirements—but offers no explanation or reasoning.[7] There is no indication whether Mr. O'Kelley in fact considered Dr. Rost's statement, whether he found the statements to be creditable and somehow consistent with his conclusion, or whether he found them not creditable and for what reason. This is not indicative of a deliberate and principled reasoning process. *Cf. Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 834 (2003) ("Plan administrators . . . may not arbitrarily refuse to credit a claimant's reliable evidence . . . .").

Dr. Bulas also asserts that the medical opinion evidence Provident relied upon to terminate his benefits lack indicia of reliability. First, he notes that Drs. Antaki, Eisenberg, Kamjoo, and Michaelson are all retained by Provident and are, thus, susceptible to bias favoring a non-disability finding. *See id*. at 832 (acknowledging that physicians retained by benefit plans "may have an incentive to make a finding of 'not disabled'"). Dr. Bulas does not offer evidence that the

---

[7] For its part, Provident argues that Dr. Bulas failed to rebut the vocational consultant's findings because he does not offer an opinion by a vocational expert. But Provident cites no case law establishing that a vocational expert's opinion is the only evidence that can (or should) affect a determination on vocational functional requirements.

physician's opinions were influenced by any such bias. But the Court notes that, in addition to none of the four being independent, none of the four physicians examined Dr. Bulas in-person. *See Autran*, 27 F.3d at 413 (noting that a plan administrator's reliance on "high-quality evaluations," as contrasted with "rest[ing] its conclusion on file reviews," is an indicator of a reasoned decision-making process); *Calvert v. Firstar Finance, Inc.*, 409 F.3d 286, 295 (6th Cir. 2005) (finding that claim administrator's "reliance on a file review does not, standing alone, require the conclusion that [it] acted improperly" but "that the failure to conduct a physical examination . . . may, in some cases, raise questions about the thoroughness and accuracy of the benefits determination"). That fact is notable as to Drs. Eisenberg and Michaelson, in particular:

> *Dr. Eisenberg.* In his first consulting opinion, Dr. Eisenberg opined that the record was "indeterminate" as to Dr. Bulas's functional capacity and that further testing "would assist in this determination." Dr. Antaki then asked Dr. Hutchins whether further testing had been considered. Dr. Hutchins had not planned to conduct the suggested testing—and Dr. Antaki did not request it or refer Dr. Bulas for a Provident-facilitated medical examination. When Dr. Bulas's file was then sent back to Dr. Eisenberg, he agreed—without the benefit of any additional testing—that Dr. Bulas could perform the duties of a diagnostic radiologist.

> *Dr. Michaelson.* Dr. Michaelson reviewed complaints made on appeal that Dr. Bulas suffered debilitating eye strain, fatigue, and headache when

he tried to rely only his left eye. Dr. Michaelson dismissed this complaint, stating that "he can find no medical basis for why these symptoms should occur." Although Dr. Michaelson referred to Dr. Hutchins's treatment notes from June 14, 2021 (a follow-up from surgery at which it is not clear whether the fact of, cause, or effect of these symptoms was broached), the opinion would have been of higher "quality" and greater reliability if Dr. Bulas's functional visual capacity had been evaluated in-person.

This concern is amplified by the equivocal tone taken in portions of their opinions. For example, Dr. Eisenberg states:

> If the distortion or a double image in one eye is deemed to "interfere" with the other, it **could** be adequately suppressed with fogging techniques or the use of a Bangerter filter.

(emphasis added). And Dr. Michaelson opined:

> [I]t is **possible** that Dr. Bulas's best-corrected visual acuity in the right eye **could** be improved significantly from the 20/40-2 recorded on 6/14/21, **possibly** improving his visual comfort/function to some degree.

(emphasis added). Perhaps with an in-person examination, Drs. Eisenberg and Michaelson would have been able to definitively determine whether a fogging technique adequately suppressed interference with left-eye function, or whether visual comfort/function could be improved. *Cf. McDonald v. W. S. Life Ins. Co.*, 347 F.3d 161, 170–71 (6th Cir. 2003) ("The mere possibility that a participant in an ERISA plan might be able to return to some type of gainful employment, in light of overwhelming evidence to the contrary, is an insufficient basis upon which to

32

support a plan administrator's decision to deny that participant's claim for LTD

benefits.").

Dr. Bulas next takes issue with Provident's reliance on this statement from

Dr. Hutchins's June 14, 2021 treatment notes:

> He has adjusted to primarily using [left eye] and is overall happy with
> his vision.

In his view, Provident takes this statement out of context and improperly uses it to

negate—or, worse, as cover to ignore—his consistent reports of difficulty with visual

functioning. The Court agrees. Drs. Antaki, Eisenberg, Kamjoo, and Michaelson all

point to this statement as support for their opinions. Provident also quotes it in its

appeal determination letter. But, at the time of the June 14, 2021 appointment, Dr.

Bulas was doing household chores, shopping for groceries, not reading—and

certainly not practicing radiology. So, the statement cannot reasonably support the

proposition that Dr. Bulas could use his left eye alone to perform the intensive,

demanding, and high-stakes work of reading and interpreting diagnostic imaging

studies. *See Kramer v. Paul Revere Life Ins. Co.*, 571 F.3d 499, 507–08 (6th Cir.

2009) (finding a plan administrator's decision to terminate a former OB/GYN's

disability benefits to be arbitrary and capricious when the decision was based on

surveillance footage showing the claimant preparing a boat for sale, when such

activity is an inappropriate proxy for performing surgeries, particularly because "on

the day she worked on her boat, she placed only her own health at risk, but while

performing deliveries or surgeries, she was responsible for the life and health of her

patients"); *see also Hanusik v. Hartford Life Ins. Co.*, No. 06-11258, 2008 WL

283714, at *5–6 (E.D. Mich. Jan. 31, 2008) (limiting the relevance of specific evidence in making a benefit determination).

Finally, Dr. Bulas points out the conflict of interest inherent in Provident's dual-role as claims administrator and payor. As with the physician-reviewers' alleged conflict, Dr. Bulas does not offer evidence that Provident's decision was the product of interested consideration. Nonetheless, "courts must consider that conflict as one factor among several in determining whether the plan administrator abused its discretion in denying benefits." *Cox v. Standard Ins. Co.*, 585 F.3d 295, 299 (6th Cir. 2009).

If one considers arbitrary and capricious review to be a shield, each of the transgressions discussed above leaves a dent. Individually, they may not amount to much—but together, they pierce the defense. On this record, the Court finds that Provident's decision was not the result of a deliberate, principled reasoning process and was, accordingly, arbitrary and capricious.

## IV.    CONCLUSION AND REMEDY

In view of the above, the Court finds that Provident's decision to terminate Dr. Bulas's benefits under the Policy cannot stand. "In cases such as these, courts may either award benefits to the claimant or remand to the plan administrator." *Elliott v. Met. Life Ins. Co.*, 473 F.3d 613, 621 (6th Cir. 2006). Remand is appropriate for "further fact-finding to supplement . . . an incomplete record." *Javery v. Lucent Tech., Inc. Long Term Disability Plan*, 741 F.3d 686, 700 (6th Cir. 2014). It is inappropriate, however, to "afford[ ] the plan administrator a chance to correct its reasoning for rejecting [p]laintiff's application." *Id.*

34

Dr. Bulas argues that he is entitled to an award of Total Disability benefits under the Policy. Provident does not argue for or request remand. Dr. Bulas's claim does not require further fact-finding. Accordingly, Dr. Bulas is entitled to reinstatement of Total Disability benefits under the Policy effective back to August 18, 2021.

Dr. Bulas's Motion for Judgment on the Administrative Record is **GRANTED**; Provident's is **DENIED**.

**IT IS SO ORDERED.**

/s/ Sarah D. Morrison
**SARAH D. MORRISON**
**UNITED STATES DISTRICT JUDGE**